# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                          Crim. No. 11-228 (MJD/JJK)

                Plaintiff,

v.

(2) Gerald Joseph Durand,                    **REPORT AND RECOMMENDATION**
also known as Jerry Durand;

                Defendant.

David J. MacLaughlin, Esq., and Tracy L. Perzel, Esq., Assistant United States Attorneys, counsel for Plaintiff.

Brian N. Toder, Esq., Chestnut Cambronne, PA, counsel for Defendant.

This matter is before this Court on Defendant Gerald Joseph Durand's Motion to Suppress Statements (Doc. No. 71). This Court held a hearing on the motions on October 5, 2011,[1] and received testimony from the following witnesses: Officer Brandon Gliem, Special Agent Matt Schommer, and Special Agent Tim Nichols. The Court also received several exhibits from the Government, including the search and seizure warrants for Defendant Durand's residence and Defendant Durand's person, and various photographs of Defendant Durand's residence. The matter was referred to the undersigned for

---

[1]      On October 6, 2011, the Court issued an Order concerning various other motions and took Defendant's Motion to Suppress Statements, under advisement for submission to the District Court on Report and Recommendation. (Doc. No. 83.)

Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc.

R. 72.1.  For the reasons stated below, this Court recommends that Defendant's

motion be denied.

## BACKGROUND[2]

On May 6, 2011, United States Magistrate Judge Jeanne J. Graham

issued a warrant to search a specific location in Faribault, Minnesota, and a

warrant to search Defendant Gerald Joseph Durand's person.  (Hr'g Exs. 1, 2.)

Defendant's motion concerns the statements that he gave to officers during the

execution of these search warrants.[3]

On May 17, 2011, Officer Gliem assisted federal agents in executing the

search warrants at Defendant Durand's residence in Faribault, Minnesota.

(Tr. 20–21.)  Prior to approaching the residence, Officer Gliem met with federal

law enforcement officers in a park at approximately 9:00 a.m. for approximately

five to ten minutes, whereby he was told that they had a search warrant for

Mr. Durand and his residence, and was shown a picture of Mr. Durand.  (Tr. 22–

---

[2]     The following summary is based on Officer Brandon Gliem, Special Agent
Matt Schommer, and Special Agent Timothy Nichols's testimony provided at the
October 5, 2011 hearing.  Officer Gliem has worked for the City of Faribault
Police Department for ten years, and is currently a police patrol officer.  (Doc.
No. 87, 10/5/11 Hearing Transcript ("Tr.") 18–19.)  Both Special Agent Matt
Schommer and Special Agent Tim Nichols work for the Internal Revenue Service
("IRS").  (Tr. 38, 85.)  Agent Schommer has worked in the Criminal Investigation
Division since 2005, and is one of the case agents assigned to this case.
(Tr. 38–39.)  Agent Nichols has worked for the IRS for seventeen years.  (Tr. 85.)

[3]     Defendant Durand does not challenge the validity of the search warrants,
nor the constitutionality of their execution.

23.)  The agents also told Officer Gliem that Mr. Durand "had previous experience as a professional wrestler, that he was a big guy"—six foot and approximately 225 pounds—and that he owned a firearm but they did not know whether he would be carrying a gun.  (Tr. 24, 33, 42–43.)  Agent Schommer testified that they "had information that Mr. Durand carries a firearm on his person when he is outside in the general public."  (Tr. 42.)

Since Officer Gliem was in a marked patrol car and was wearing a police uniform, he then led the agents to Mr. Durand's residence.  (Tr. 23.)  Once at the residence, Officer Gliem approached the front door along with four to five law enforcement agents.[4]  (Tr. 24, 27–28.)  He then "knocked on the door several times announcing: Police, search warrant.  Police, search warrant."  (Tr. 24.)  After about a minute, Mr. Durand answered the front door.  (Tr. 26.)  At this time, none of the officers had their guns drawn.  (Tr. 26, 50.)  Officer Gliem then "took ahold of [Defendant Durand's] right arm, escorted him out on to the porch, explained to him [they] were there to serve a warrant[,] and put him in handcuffs."  (Tr. 26–27.)  Officer Gliem told him to have a seat on the porch, and explained to him that he was not under arrest and that they were just securing him while

---

[4]     Altogether, thirteen law enforcement officers were at Mr. Durand's residence that day; there were ten special agents and three local police officers. (Tr. 33, 79.) The other law enforcement agents approached the back door of the residence upon arrival.  (Tr. 43.)

agents secured the house.  (Tr. 27.)[5]  Officer Gliem did not give Mr. Durand

*Miranda* warnings.  (Tr. 34.)

One agent stayed outside with Officer Gliem and Defendant Durand, while

the other agents, including Special Agent Schommer, entered the residence to

conduct a protective sweep.[6]  (Tr. 28, 51.)  The agent accompanying Officer

Gliem told Mr. Durand to relax, that he was not under arrest, that they were there

to serve a warrant, and that they would take the handcuffs off in a moment after

the house was secured.  (Tr. 28, 34.)  The agent then searched Mr. Durand's

person.  (Tr. 29.)  Officer Gliem does not recall Mr. Durand making any

spontaneous statements at this time, but Mr. Durand was shaking his head

acknowledging that he understood as Officer Gliem and the other agent were

talking to him.  (Tr. 29–30.)  Mr. Durand's demeanor was described by Officer

Gliem as "genuinely surprised," but that he seemed "conscious of the situation"

---

[5]     Officer Gliem testified that this was the typical way to handle people identified at a residence where a search warrant is being executed, especially when they have information that the person maybe armed (or that the person has previous wrestling experience).  (Tr. 27.)

[6]     Officer Gliem and Agent Schommer explained that a protective sweep is when the officers search a residence to make sure that there is no one else inside or potential hazards that could harm officers while executing the search warrant.  (Tr. 28, 51.)  If occupants are found, they are typically moved into a centralized area.  (Tr. 52.)  During the protective sweep of Mr. Durand's residence, Agent Nichols encountered Mrs. Durand.  (Tr. 52.)  He escorted her to the living room area and sat with her during the remainder of the protective sweep.  (Tr. 86.)  Mrs. Durand was not placed under arrest and was not handcuffed.  (Tr. 86.)  After the protective sweep, Agent Nichols went outside to retrieve his computer.  (Tr. 86.)

and knew what was going on.  (Tr. 31.)  At no time when Mr. Durand was on his porch with Officer Gliem and the other agent did he say that he wanted to leave or demand that he be unhandcuffed.  (Tr. 30–31.)

After approximately ten minutes, one of the other agents came outside the residence and advised the FBI agent standing with Officer Gliem that the residence was clear.  The agent accompanying Officer Gliem then nodded toward Officer Gliem, and Officer Gliem removed Mr. Durand's handcuffs. (Tr. 30.)  At that time, Mr. Durand walked inside the house with the federal agents walking in behind him; none of the agents had ahold of Mr. Durand at this time.  (Tr. 30–31.)  It was then determined that Officer Gliem was no longer needed, so he left.  (Tr. 36–37.)

The first floor of Mr. Durand's home included an entryway, a hutch area, a living room, a dining room, a butler's pantry with a telephone, and a kitchen with a back door that exits the residence.  (Tr. 53–58.)  After the protective sweep was concluded, Agent Schommer saw Mr. Durand sitting at the end of the dining room table alone; Mr. Durand was not handcuffed.[7]  (Tr. 58, 62.)  At that time, Agent Schommer stood to the right of the table and FBI Special Agent Eileen Rice stood to the left of the table.  (Tr. 59, 60–61.)  Agent Schommer was wearing an IRS vest and was carrying a handgun in a hip holster.  (Tr. 78.)

---

[7]     At that time, Mrs. Durand was near the dining room table in the living room area.  (Tr. 58.)  At some point, Mrs. Durand assisted the agents in locating a key to a safe deposit box, and moved to the back porch area.  (Tr. 61–62.)

Agent Rice was also armed at the time, however it is unclear whether her weapon was visible.  (Tr. 78–79.)

Agent Schommer told Mr. Durand that he was a target of the Federal Grand Jury investigation.  (Tr. 63.)  And Agent Rice told Mr. Durand that he was not under arrest, that he was free to leave, and that he did not have to speak if he did not want to.  (Tr. 62.)  Agent Rice also told Mr. Durand that his wife was not under arrest and was not a target of the investigation.  (Tr. 63.)  At that point, Mr. Durand stated, "I am glad you guys are here.  I wanted to talk to you.  I have done nothing wrong and I was deceived by Cook, Trevor Cook."  (Tr. 64.)  Agent Rice and Agent Schommer then briefly exited the room to decide whether they really wanted to sit down and interview Mr. Durand.  (Tr. 67.)  Prior to the execution of the search warrants, for various reasons they had planned on not attempting to interview Mr. Durand during the search.[8]  (Tr. 41.)  Agent Rice and Agent Schommer ultimately decided to interview Mr. Durand and returned to the dining room.

---

[8]    When Agent Rice and Agent Schommer were outside the presence of Mr. Durand, Special Agent Tim Nichols would have been in the room with Mr. Durand – there were other instances when Agent Rice or Agent Schommer had to briefly leave the room to answer questions since they were the case agents present.  (Tr. 68–69.)  Agent Nichols was assigned to inventory evidence found during the search.  (Tr. 69, 85.)  He had set up the IRS's computer and printer for inventory purposes at the dining room table opposite where Mr. Durand was sitting.  (Tr.  69, 87–88.)  During those instances when Mr. Durand and Agent Nichols were in the room together, Mr. Durand made no indication that he wanted to leave and made no inquiry about whether he should call his attorney.  (Tr. 88, 90–91.)  The two of them only engaged in small-talk about wrestling and whether there was a gravel pit nearby.  (Tr. 88–89.)

Mr. Durand then asked whether he needed an attorney.  (Tr. 64.)  Agent Rice advised Mr. Durand that neither she nor Agent Schommer could give advice as to whether he needs an attorney, and that if he wanted to contact an attorney, he was more than welcome to do that.  (Tr. 64–65.)  She also told him that if he wanted to contact an attorney they would cease discussions with him.  (Tr. 65.)  The agents did not provide a *Miranda* warning.  Mr. Durand said that he would like to know the questions that were going to be asked of him before he would contact an attorney.  (Tr. 65.)  And then he pointed to some documents on the table and stated that he had an appointment set up with his accountant that day to prepare his 2009 tax returns, and that all of his documents were right there. (Tr. 65–66.)

Agent Schommer then asked Mr. Durand about a $400,000 movie deal in which he invested in the production of a movie in the Twin Cities.  (Tr. 66.) Mr. Durand responded that $400,000 was his profit and that if he had done anything wrong, it was with his taxes.  (Tr. 67.)  The interview then proceeded whereby the agents asked Mr. Durand questions about various topics.  (Tr. 71– 73.)  During the interview, Mr. Durand asked a couple of more times whether he needed an attorney.[9]  (Tr. 71.)  The agents' response each time was that they could not advise him as to whether he needed to call an attorney and that if he

---

[9]     Agent Schommer testified that at these points, Mr. Durand did not state that he wanted his attorney or that he was going to call his attorney.  (Tr. 71.)

wanted to call one, he was welcome to and that they would then be done with the interview.  (Tr. 71.)

Agent Rice and Agent Schommer's interview with Mr. Durand—excluding the time when they exited the room—lasted approximately twenty minutes. (Tr. 83.)  At no point did the agents tell Mr. Durand that he was not free to leave or that he had to answer questions.  (Tr. 63–64.)  Nor did Mr. Durand make any verbal or non-verbal indication that he wished to end his conversation with them or wished to get up and leave.  (Tr. 75.)  Also, at no time did Agent Rice or Agent Schommer try to trick Mr. Durand or lie to him in an attempt to get him to say something to them.  (Tr. 73.)  At some point, Mr. Durand did state that he was going to call his attorney, which he did.  (Tr. 65, 74.)  The interview then ceased. (Tr. 65, 74.)  Sometime thereafter, either Mr. Durand or his wife asked to talk with the other.  (Tr. 74–75.)  The agents told them that was fine, and let the two of them talk to each other in the kitchen.  (Tr. 75.)  The Durands then asked if they could leave.  (Tr. 75.)  The agents told them yes.  (Tr. 75.)  After Mrs. Durand went upstairs and washed up, the two of them got in their vehicle and left. (Tr. 75–76.)

On July 19, 2011, Mr. Durand was subsequently indicted for Wire and Mail Fraud in violation of  Title 18, United States Code, Sections 2, 1341, and 1343; Conspiracy to Commit Mail and Wire Fraud in violation of Title 18, United States Code, Section 371; and Money Laundering in violation of  Title 18, United States

Code, Sections 1957 and 2.  Three days later, Mr. Durand self-reported to the U.S. Marshals.

## DISCUSSION

Defendant asserts that the "singular issue before the Court is whether or not [D]efendant was subject to a custodial interrogation that requires a *Miranda* warning when his home was invaded by law enforcement officers on May 17, 2011."  (Doc. No. 113, Post Hr'g Brief in Supp. of Def.'s Mot. to Suppress Statements 1.)  Defendant contends that he was, and therefore any statements he made in his residence on May 17, 2011, should be suppressed because the statements were not made after a valid waiver of Defendant's rights pursuant to *Miranda*.  The Government opposes the motion and asserts that Defendant's statements were non-custodial.

"[P]olice officers are not required to administer *Miranda* warnings to everyone . . . they question."  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Rather, *Miranda* warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)); *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984) (same); *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (same).  In addition, the requirements of *Miranda* arise only when a defendant is both in custody and being interrogated.  *United States. v. Head*, 407 F.3d 925, 928 (8th Cir. 2005).  Once a suspect is in police custody and

9

subject to interrogation, the suspect must be informed of his constitutional right to
remain silent and to be represented by legal counsel during questioning.  *See*
*Miranda*, 384 U.S. at 467–68, 471–72.

"In determining whether an individual was in custody, a court must
examine all of the circumstances surrounding the interrogation, but 'the ultimate
inquiry is simply whether there [was] a formal arrest or restraint on freedom of
movement of the degree associated with a formal arrest."  *Stansbury*, 511 U.S. at
322 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (further
quotations omitted).  A list of common indicia of custody that has been identified
by our Court of Appeals includes the following:

> (1) whether the suspect was informed at the time of questioning that
> the questioning was voluntary, that the suspect was free to leave or
> request the officers to do so, or that the suspect was not considered
> under arrest; (2) whether the suspect possessed unrestrained
> freedom of movement during questioning; (3) whether the suspect
> initiated contact with authorities or voluntarily acquiesced to official
> requests to respond to questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during questioning;
> (5) whether the atmosphere of the questioning was police
> dominated; or (6) whether the suspect was placed under arrest at
> the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see also United*
*States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004), *cert. denied*, 544 U.S.
1060 (2005).  These factors "are by no means exhaustive and should not be
applied ritualistically, counting indicia which contribute to custody against those
which detract."  *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir.
2005).  Instead, the *Griffin* factors serve as a guide in the resolution of the

ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 828.

Further, whether or not *Miranda* is implicated, the Supreme Court has recognized that, in order for a confession (or incriminating statement), to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's protection against self-incrimination. *See Dickerson v. United States*, 530 U.S. 428, 433–34 (2000) (stating that the Supreme Court applies the due-process-voluntariness test). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Id.* at 434. A statement is involuntary if it "was extracted by threats, violence, or . . . promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123 (8th Cir. 2001) (quotations omitted).

Whether a defendant's will has been overborne is determined by an examination of the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure. *Brave Heart*, 397 F.3d at 1040. Some factors this Court may consider in evaluating the totality of the circumstances include: the youth of the accused; the level of education of the accused; the lack of advice to the accused of his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical

punishment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Brave Heart*, 397 F.3d at 1041 ("[O]fficers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices . . . . None of these tactics render a confession involuntary, however, unless the overall impact of the interrogation caused the defendant's will to be overborne.") (quotations and citation omitted).  The government bears the burden of proving voluntariness by a preponderance of the evidence. *Brave Heart*, 397 F.3d at 1040.

Here, Defendant has moved to suppress the statements that he made on May 17, 2011.  Defendant argues that looking at the totality of the circumstances, he was in custody because thirteen armed agents invaded his home, he was told that he was not under arrest while he was handcuffed, and he was thereafter seated at a table with an officer on each side of him, all of which created a police-dominated environment.  Defendant also asserts that his movement was restrained while he was handcuffed, and that it was further restrained while he was seated at his dining room table, which is reflected in the officer testimony stating that they "let" Mr. Durand and Mrs. Durand talk to each other.  In addition, Defendant argues that strong-arm tactics and deceptive stratagems were employed during questioning because the beginning of the interview started with Agent Schommer advising Defendant that he was the target of a grand-jury

investigation, and because the agents construed Defendant's inquiry as to whether he should confer with a lawyer as a request for legal advice, ignoring the more direct issue as to whether Defendant wanted his attorney or wanted to call his attorney.

The Government does not dispute that Defendant was not provided with a *Miranda* warning prior to his unsolicited statements being made or prior to the interview. The pertinent inquiry is, therefore, whether Defendant was in custody, and, if not, whether his statements were otherwise involuntary. This Court finds that the totality of circumstances compels the conclusion that Defendant was not the subject of custodial interrogation on May 17, 2011, that *Miranda* warnings were not required, and that Defendant's statements were voluntary.

According to the uncontroverted testimony, Defendant was temporarily placed in handcuffs while the agents completed a protective sweep of the home, he was released from the handcuffs once the protective sweep was finished, the agents had a right to be in the home based on the search warrant, no agent gave Defendant a *Miranda* warning, Defendant offered some comments prior to any questioning by any agent, and Defendant answered some of the agents' questions. Further, when Defendant Durand was on his porch after being handcuffed, Officer Gliem and the agent accompanying him separately assured Defendant Durand that he was not under arrest, that they were there to serve a warrant, and that they would take the handcuffs off after the house was secured. Defendant Durand then left the porch, entered his home, and sat at his dining

room table.  Once seated at the table, Agent Rice told Defendant that neither he

nor his wife was under arrest, that he was free to leave, and that he did not have

to speak if he did not want to.  Agent Schommer's testimony indicates that after

providing Defendant these statements, Defendant was willing to speak with the

agents because he offered certain statements indicating that he was glad they

were there and that he wanted to talk with them without even having been

questioned.[10]  In addition, after being told by the agents that they could not give

advice as to whether he needs an attorney, that if he wanted to contact an

attorney he was more than welcome to, and that if he wanted to contact an

attorney their discussions with him would stop, Defendant Durand continued to

answer the agents' questions without asking for his attorney.  There is no

---

[10]     This Court notes that even if Defendant were found to be in custody at this point in time, these particular statements made by Defendant were not the result of an interrogation.  Agent Rice and Agent Schommer were not asking Defendant to make statements, but were only informing him of the reason they were there. Interrogation includes both direct questioning by officers and words or actions that officers should know are "'reasonably likely to elicit an incriminating response from the suspect.'"  *United States v. Broines*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  Voluntary statements that are not in response to interrogation are admissible with or without the giving of *Miranda* warnings.  *Head*, 407 F.3d at 928.  An officer telling a suspect what is happening or what charges have been made against him is not "interrogation" for *Miranda* purposes.  *See United States v. Wipf*, 397 F.3d 677, 685 (8th Cir. 2005) ("[A]n inculpatory statement is not considered the product of custodial interrogation merely because it is made after the suspect has been told the charges against him.").  Further, "[p]olite conversation is not the functional equivalent of interrogation" for *Miranda* purposes.  *See United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006).  Therefore, the statements that Defendant Durand made to Agent Nichols when Agents Rice and Schommer were out of the room were not a product of interrogation either.

evidence that the agents told Defendant anything that was not true or used

trickery in order to get him to answer questions.  The uncontroverted testimony

indicates that once Defendant stated that he wanted to call his attorney, he was

allowed to do so, and all questioning stopped.  Further, Defendant and his wife

were free to leave, which they did.

Strong evidence of restraint of freedom of movement is required to

overcome the natural inference that questioning is non-custodial when the

defendant is questioned in the familiar surroundings of his own home, is advised

that he is free to leave, and is not arrested at the conclusion of the interview or

the search.  *See Czichray*, 378 F.3d at 830; *United States v. LeBrun*, 363 F.3d

715, 722 (8th Cir. 2004).  Here, although the agents initiated the contact,

Defendant volunteered statements prior to any questioning by the agents, and he

answered the agents' questions after being told that he could call his attorney if

he wanted to.  There is nothing in the record to suggest that the agents

restrained Defendant's freedom of movement in any way, and there is no

evidence that the agents employed any deceptive stratagems, strong-arm tactics,

or even raised their voices, at any time during the interview.  The information that

the agents provided about how he could call an attorney if he wanted to, and that

they could not advise him on whether he needed an attorney or not, was

accurate information.   And while the agents did inform Defendant that he was

part of a grand-jury investigation, and therefore perhaps implied that they had

information about him, this type of coercion does not render the interview

custodial.  *See LeBrun*, 363 F.3d at 721 ("[S]ome degree of coercion is part and parcel of the interrogation process and . . . the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.").

The interview took place in the comfort of Defendant's home by two law enforcement agents, rather than inside a law enforcement building, which tends to show that the atmosphere of the interview was not police-dominated.  *See Beckwith v. United States*, 425 U.S. 341, 342–43, 347–48 (1976) (affirming no custody when defendant was interviewed by two IRS agents at the dining room table of a private home where he occasionally stayed).  Although an interview with law enforcement about one's possible fraudulent activity during the execution of a search warrant in one's own home is unlikely to be a relaxed conversation, it is undisputed that the officers repeatedly told Defendant that he could call his attorney if he wanted to.  Only two agents participated in the interview—although others were executing the search warrant—and the interview was conducted in approximately twenty minutes, which is not unduly long.  *See Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (stating that a seven-hour interview was not per se unconstitutional).  Also, Defendant was not arrested at the end of the interview.  *See LeBrun*, 363 F.3d at 722 (stating that the lack of arrest is a "very important factor weighing against custody" (quoting *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002)).  In addition, the record

reflects that the agents informed Defendant that he was free to leave, that he did not have to speak if he did not want to, and that the interview would be stopped if he wanted to contact his attorney. *See Czichray*, 378 F.3d at 830 ("Where a suspect is questioned in the familiar surroundings of his home, and informed several times of his right to terminate the interview at will, we believe that strong evidence of restraint on freedom of movement of the degree associated with a formal arrest is necessary to overcome the natural inference that such questioning is non-custodial."). Defendant has provided no rebuttal evidence showing that he was intimidated to participate in the agents' questioning by any acts or statements of the agents. And up until the point when Defendant asked to call his attorney, the record does not reflect that Defendant asked the officers to stop their questioning, to leave him alone prior to the end of the interview, or to stop asking any particular line of questions.

Furthermore, the Court finds no grounds to conclude that the existence of certain circumstances inherent to the execution of a search warrant (i.e., initially handcuffing Mr. Durand during the protective sweep when they had information that Mr. Durand may be carrying a weapon and moving Defendant's wife into the living room to ensure a secure scene and officer safety), can properly be equated to indicia of custody. *Cf. United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009) ("Protective searches allow for the use of handcuffs.") Although the sudden appearance of numerous agents wearing FBI or IRS jackets at one's home is obviously intimidating, this circumstance is typical of a search-warrant

execution.   Essentially this circumstance relates to nuances of whether there was a police-dominated atmosphere, use of deception and strong-arm tactics, and voluntary acquiescence to an interview.   Here, the sudden arrival of FBI and IRS agents simply does not outweigh the objective, undisputed facts that indicate the absence of a custodial situation.  *See Czichray*, 378 F.3d at 828.   Placing Mr. Durand in handcuffs and having his wife sit in the living room during the initial security sweep is not indicative of Defendant's custody, but rather is simply the cautious—and reasonable—conduct that would be expected in the execution of a lawful search warrant in a private residence.   Therefore, after considering the *Griffin* factors, this Court concludes that Defendant was not in custody during the interview with the agents on May 17, 2011, and suppression of Defendant's statements based on the failure to advise him of his *Miranda* rights is not required.

Even in the absence of a custodial interrogation, the Court must also determine, consistent with the requisites of the Fifth Amendment, whether the statements given by Defendant were voluntary, or whether they were the product of an overborne will.   Based on the record presented, this Court finds no evidence to reflect that Defendant's statements were involuntary, or that there were any specific instances of coercion.   Indeed, the record reflects that the interview was the product of Defendant's own decision to cooperate with law enforcement.   The length of the interview was not unduly burdensome, the Defendant was within the comfort of his own home, and he was not tricked into

lending cooperation to an investigation that he was otherwise resisting. Moreover, Defendant does not assert the existence of any physical or mental impairments that would impact the voluntariness analysis. Accordingly, viewing the totality of the circumstances, this Court finds that Defendant's will was not overborne and the statements that he made during the May 17, 2011 interview were voluntary. Therefore, Defendant's motion to suppress the May 17, 2011 statements should be denied.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.     Defendant Gerald Joseph Durand's Motion to Suppress Statements (Doc. No. 71), be **DENIED**.


Date: October 24, 2011

_s/Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **November 7, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.